**FOR PUBLICATION IN WEST'S HAWAIʻI REPORTS AND PACIFIC REPORTER**

Electronically Filed
Intermediate Court of Appeals
CAAP-24-0000380
23-JUN-2026
03:44 PM
Dkt. 66 OP

NO. CAAP-24-0000380

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAIʻI

---o0o---

RCA TRADE CENTER, INC., a Hawaii corporation; and
MP UNIT 21, LLC, a Texas limited liability company,
Plaintiffs-Appellants,
v.
WAYNE MASAO MUN KEONG HU, TARA LEIKO HU,
Defendants-Appellees, and
DOES 1-10, Defendants.

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CASE NO. 1CCV-23-0001388)

JUNE 23, 2026

LEONARD, PRESIDING JUDGE, MCCULLEN AND GUIDRY, JJ.

OPINION OF THE COURT BY MCCULLEN, J.

Plaintiffs-Appellants RCA Trade Center, Inc., and MP Unit 21, LLC, (collectively, **RCA**) appeal from the Circuit Court of the First Circuit's May 20, 2024 order granting Defendants-Appellees Wayne and Tara Hu's (together, **the Hus**) motion to dismiss brought pursuant to Hawaiʻi Revised Statutes (**HRS**)

Chapter 634G, the Hawaiʻi Public Expression Protection Act (**HPEPA**), and May 21, 2024 Final Judgment.[1]

On appeal, RCA challenges the circuit court's (1) finding of good cause for the Hus' untimely filing of their HPEPA motion to dismiss, (2) dismissal of its complaint, and (3) award of fees and costs.  We affirm.

We hold that the circuit court did not (1) abuse its discretion by finding good cause for the Hus' untimely filing or (2) err by dismissing RCA's complaint under HPEPA.  We further hold that (3) RCA waived any challenge to the circuit court's award of attorney's fees.

## I.    BACKGROUND

### A.    Factual Background

In 2016, the Hus acquired a unit within Marconi Point Condominiums, an agricultural condominium project (**the Project**) located in Kahuku, Oʻahu, Hawaiʻi.  The Project comprises "two (2) lots totaling 96 acres of AG-2 zoned lands" that were "'condominiumized' by the developer into 32 units."  "The Project aims to develop agricultural condominiums for active farming and other agricultural operations" and "is not a residential development."  "However, zoning laws allow 'farm dwellings' to be constructed within the Project to house individuals engaged in the Project's agricultural operations,

_____

[1]  The Honorable John M. Tonaki presided.

consistent with what is permitted under applicable zoning ordinances."

In 2017, RCA applied for and received multi-building permits from the City and County of Honolulu's Department of Planning and Permitting (**DPP**) to construct eight pre-fabricated steel warehouses on their various units within the Project.

Believing the "Project would remain a quiet agricultural condominium project, with few farm dwellings and neighbors" at the time they purchased the unit, the Hus became concerned about "numerous questionable and possibly unlawful activities occurring within the Project" over the next eight years.

These activities — which the Hus believed "substantially changed the nature and character of the Project[] and[] . . . impacted the North Shore Community and the interest of the public with respect to protecting both agricultural lands from non-compliant uses as well as activities that adversely affected the environment" — included (1) the "construction of eight (8) massive metal warehouses . . . on the AG-2 zoned lands[] . . . for the purpose of advertising and leasing spaces . . . to the public for non-agricultural uses"; (2) noncompliance with DPP's special management area and building permit requirements; (3) "hosting illegal and noncompliant uses on AG-2 lands such as 'non-compliant farmers'

markets', 'pop-up markets', weddings, craft fairs, and other social gatherings, some of which utilized [RCA's] warehouse spaces"; and (4) "allowing people vehicular access to the beach areas for 'four-wheeling' in sensitive environmental areas having endangered species."

As to the eight warehouses, RCA "applied for and received a United States Department of Agriculture Rural Development Business and Industrial Guaranteed Loan of $7,883,000" (**the Loan**) to "finance the construction of the warehouses." According to RCA, the "program does not provide direct funding but only a federal guaranty to secure repayment obligations in the event of a borrower's default." North Avenue Capital was RCA's lender under the program.

Meanwhile, as discussed in more detail below, the Hawaiʻi Legislature adopted the Uniform Law Commission's model Uniform Public Expression Protection Act (**UPEPA**) as HPEPA in 2022. 2022 Haw. Sess. Laws Act 96, § 1 at 215-16.

Concerned "that the questionable activities put the Project in danger of being investigated and cited by various federal, state and county governmental agencies," the Hus hired Peter J. **Lenhart**, Esq., to draft a letter to RCA addressing these and other issues.

On August 29, 2023, Lenhart transmitted the "52-page letter . . . together with Exhibits '1' through '17'" (**the

**Letter**) to RCA, its counsel, and ten additional governmental entities, including DPP, the State of Hawaiʻi Department of Land and Natural Resources, the State of Hawaiʻi Department of Agriculture, and the U.S. Department of Agriculture (**USDA**).

On September 1, 2023, North Avenue Capital contacted RCA for more information about the Letter, which it received from the USDA. Following the USDA's inquiry into the Letter, North Avenue Capital "informed [RCA] that [it] would be putting a hold on draws from the loan proceeds, which were needed to pay for ongoing construction costs."

Although RCA attempted to assuage North Avenue Capital's concerns, in part by filing the instant lawsuit, North Avenue Capital ultimately "declared [RCA] to be in default of [its] obligations under the loan." "Since December 2023, [RCA has] been able to resolve [North Avenue Capital]'s concern, pending USDA consent to the loan modification."[2]

B.   **Procedural Background**

On October 25, 2023, less than two months after receiving the Letter, RCA filed a three-count complaint against the Hus, asserting causes of action for Declaratory Relief, Tortious Interference, and Injunctive Relief.

Count I (Declaratory Relief) sought a "declaratory ruling that the warehouses may remain on [RCA's] Units, that

_____

[2]  RCA does not explain how or why the Loan was modified.

5

[RCA is] not required to remove the warehouse[s] that have already been constructed, and that [RCA] may continue with construction of the warehouses as intended":

**COUNT I**
**DECLARATORY RELIEF**

59. Plaintiffs incorporate by reference each of the allegations in all previous paragraphs.

60. A controversy exists between Plaintiffs and Defendants concerning Plaintiffs' construction of the warehouses.

61. Construction of the warehouses is permitted under all applicable laws and the Declaration.

62. A declaratory ruling will serve to terminate the uncertainty or controversy giving rise to this proceeding.

63. Plaintiffs are entitled to a declaratory ruling that the warehouses may remain upon Plaintiffs' Units, that Plaintiffs are not required to remove the warehouse [sic] that have already been constructed, and that Plaintiffs may continue with construction of the warehouses as intended.

Count II (Tortious Interference) alleged the Hus "intended to purposefully interfere with the contractual relationship among [RCA], [North Avenue Capital], and the federal government":

**COUNT II**
**TORTIOUS INTERFERENCE**

64. Plaintiffs incorporate by reference each of the allegations in all previous paragraphs.

65. The USDA Loan constitutes a valid and binding contract among Plaintiff RCA Trade Center, its lender, and the federal government.

66. Defendants have knowledge of the USDA Loan and underlying contractual relationship, in light of the fact that they transmitted their [Letter] to the USDA and questioned the use of federal funds for construction of the warehouses (although as explained above, the USDA has not actually provided any federal funding, only a guaranty).

6

67. By transmitting their [Letter] to the USDA and other governmental agencies, Defendants intended to purposefully interfere with the contractual relationship among Plaintiff RCA Trade Center, its lender, and the federal government.

68. As a direct and proximate result of Defendants' interference, Plaintiffs have incurred damages.

69. The damages incurred by Plaintiffs include without limitation, additional costs associated with responding to and mitigating the effects of Defendants' untruthful allegations, reassuring Plaintiff RCA Trade Center's lender, and otherwise confirming the propriety of Plaintiffs' past and anticipated construction activities, both through the declaratory rulings sought in this lawsuit and otherwise.

70. Defendants' actions were made with the intent and malice to harm Plaintiffs' contractual and business relationships without legal justification.

71. Under the foregoing circumstances, Plaintiffs are entitled to an award of damages in an amount to be proven at trial.

Count III (Injunctive Relief) alleged RCA was entitled to an injunction preventing the Hus from further interfering with its contractual relationships:

**COUNT III**
**INJUNCTIVE RELIEF**

72. Plaintiffs incorporate by reference each of the allegations in all previous paragraphs.

73. Plaintiffs are entitled to an injunction enjoining Defendants from interfering with Plaintiffs' contractual, business, and other relationships with Plaintiff RCA Trade Center's lender and the government.

The Hus were served with RCA's complaint on November 30, 2023. That same day, in a telephone conference between Lenhart and RCA's counsel, the parties agreed to extend the deadline for responsive filings to January 17, 2024. Lenhart had requested an extension in order to secure insurance defense counsel from one of the Hus' three insurance carriers.

But Lenhart's efforts were ultimately unsuccessful. All three insurance carriers denied the Hus' request for indemnification and defense, with the last denial letter received on January 20, 2024.

"Pending resolution of [the Hus'] insurance coverage matters," RCA and the Hus nevertheless agreed, in a joint report (conferred on January 11, 2024 and signed and filed on January 25, 2024) "to delay Initial Disclosures."[3]

On March 15, 2024, the Hus filed a motion to dismiss RCA's complaint pursuant to HPEPA. RCA opposed the motion as untimely, and the circuit court heard arguments on April 24, 2024.

At the hearing, as to the timeliness issue, Lenhart explained that he interpreted the statement in the joint report to mean "that opposing counsel was agreeing that we were going to put everything kind of on hold on this proceeding until we knew whether or not" one of the insurance carriers was going to defend the Hus against RCA's complaint. As such, Lenhart "treated the receipt of the final insurance denial letter [on January 20, 2024,] as the start of a new 'clock' as to the 60-day period for filing Defendants' Anti-SLAPP Motion."

The circuit court ultimately found in Lenhart's explanation good cause for the late filing, because "there

_____

[3] Initial disclosures were to be made on or before February 15, 2024.

seem[ed] to have been some understanding [between RCA and the Hus] that everything would be delayed or put off until the insurance matter was scheduled."

As to the substantive issues presented by the motion, the circuit court determined (1) the Letter fell within HPEPA's scope, (2) RCA did not state claims for which relief could be granted, and (3) DPP was not a party:

> [T]he Court does find that the instant claims by plaintiffs fall under Chapter 634G and that the defendants were exercising their constitutional First Amendment rights or the rights of any citizen to bring complaints regarding the permitting and other issues surrounding this property. And that under 634G the claims of the plaintiff should be dismissed.
>
> The Court is also concerned -- I mean, in addition to the finding that it falls under political speech, what the defendants did, the Court is also concerned that the claims don't [state] claims to which relief can be granted as against the defendants.
>
> The declaratory relief, injunctive relief, some type of approval of the structures involved or the developments involved, the Court would need to hear from the building department as a party. The Hus don't have any jurisdiction or any power over the granting [of] those permits.

(Formatting altered and emphases added.)

The circuit court entered its order granting the Hus' motion on May 20, 2024. In addition to finding good cause for the untimely filing, the circuit court ruled that the Letter fell under HRS Chapter 634G:

> 3. Plaintiffs' claims arose in part following Defendants' [Letter] to Plaintiffs, copies of which were also sent to various government agencies. Although the [Letter] was directed to Plaintiffs, because it was also transmitted to government agencies, this action constitutes an exercise of Defendants' constitutional right to petition the government. Therefore, the claims asserted in the [Letter] fall under the scope of [Hawaiʻi] Revised Statutes ch. 634G.

The circuit court entered its final judgment on May 21, 2024. RCA appealed.

## II. SLAPP and HPEPA

SLAPP is an acronym for a "Strategic Lawsuit Against Public Participation." Perry v. Perez-Wendt, 129 Hawaiʻi 95, 99, 294 P.3d 1081, 1085 (App. 2013). "The paradigm SLAPP is a suit filed by a large developer against environmental activists or a neighborhood association intended to chill the defendants' continued political or legal opposition to the developers' plans." Hupp v. Freedom Commc'ns, Inc., 163 Cal. Rptr. 3d 919, 922 (Cal. Ct. App. 2013). "While SLAPP suits 'masquerade as ordinary lawsuits' the conceptual features which reveal them as SLAPPs are that they are generally meritless suits brought by large private interests to deter common citizens from exercising their political or legal rights or to punish them for doing so." Hernandez v. Zook, 351 A.3d 795, 798 (Pa. Super. Ct. 2026) (quoting Unif. Pub. Expression Prot. Act § 1 cmt. (Unif. L. Comm'n 2020)).

An "anti-SLAPP law is designed to protect persons from lawsuits intended to chill their free speech or petitioning activities related to public issues." City & County of Honolulu v. Chevron Corp., 157 Hawaiʻi 340, 341, 577 P.3d 82, 83 (App. 2025).

In 2020, UPEPA sought to harmonize the different states' varying approaches to combating SLAPP suits "by enunciating a clear process through which SLAPPs can be challenged and their merits fairly evaluated in an expedited manner." Unif. Pub. Expression Prot. Act Prefatory Note (Unif. L. Comm'n 2020). UPEPA thus "serves two purposes: protecting individuals' rights to petition and speak freely on issues of public interest while, at the same time, protecting the rights of people and entities to file meritorious lawsuits for real injuries." Unif. Pub. Expression Prot. Act Prefatory Note (Unif. L. Comm'n 2020).

In 2022, the Hawaiʻi Legislature repealed HRS Chapter 634F, Hawaiʻi's previous anti-SLAPP statute, and adopted UPEPA by enacting HRS Chapter 634G, HPEPA. 2022 Haw. Sess. Laws Act 96, § 1 at 215-16.

Upon a motion to dismiss based on HPEPA, the court must dismiss a cause of action or part of a cause of action if (1) the movant proves HPEPA applies; (2) the non-movant fails to prove an exception applies; and either (3)(A) the non-movant fails to prove a prima facie case as to each element of each cause of action or (3)(B) the movant proves the non-movant failed to state a cause of action upon which relief can be granted or the movant proves there is no genuine issue of material fact:

**[§634G-6] Dismissal of cause of action.**

(a) In ruling on a motion under section 634G-3(a), the court shall dismiss with prejudice a cause of action or part of a cause of action if:

    (1)    The moving party establishes under section 634G-2(a) that this chapter applies;

    (2)    The responding party fails to establish under section 634G-2(b) that this chapter does not apply; <u>and</u>

    (3)    <u>Either</u>:

        (A)    The responding party fails to establish a prima facie case as to each essential element of the cause of action; <u>or</u>

        (B)    The moving party establishes that:

            (i)    The responding party failed to state a cause of action upon which relief can be granted; or

            (ii)    There is no genuine issue as to any material fact and the party is entitled to judgment as a matter of law on the cause of action or part of the cause of action.

HRS § 634G-6(a) (Supp. 2022) (formatting altered and emphases added).

HPEPA is to be "construed liberally to fully effectuate its purposes and intent to protect the exercise of the right of freedom of speech and of the press, the right to assemble and petition, and the right of association, guaranteed by the United States Constitution or [Hawaiʻi] State Constitution." HRS § 634G-10 (Supp. 2022). Hawaiʻi appellate courts must also consider the rulings of other states that

enacted UPEPA, "to promote uniformity of the law with respect to its subject matter."  HRS § 634G-11 (Supp. 2022).[4]

A motion to dismiss under HPEPA must be filed "no later than sixty days after a party is served with a complaint, crossclaim, counterclaim, third-party claim, or other pleading . . . or at a later time on a showing of good cause."  HRS § 634G-3(a) (Supp. 2022).

### III. DISCUSSION

RCA's points of error on appeal challenge the circuit court's (1) finding of good cause for the Hus' untimely filing of their motion to dismiss; (2) dismissal under HPEPA; and (3) award of attorney's fees and costs.

### A.  Circuit Court Did Not Abuse Its Discretion When It Found Good Cause for the Untimely Filing

First, RCA contends the circuit court "should have denied the motion as untimely under" HRS § 634G-3(a), because the Hus' "delay in filing the Motion to wait for insurance coverage determinations is not good cause."  (Some formatting altered.)

A motion to dismiss a complaint under HPEPA must be filed within sixty days of being served with the complaint "or at a later time on a showing of good cause":

---

[4]  Hawaiʻi courts may also refer to the commentary to UPEPA to aid in interpreting HPEPA.  Cf. State v. Hopkins, 60 Haw. 540, 543 n.2, 592 P.2d 810, 812 n.2 (1979) (referring to statutory commentary to "aid in understanding the section" but not as an indication "of legislative intent").

> **[§634G-3] Required procedures; motions; stays.** (a) Notwithstanding any law to the contrary, including rules of the court, no later than sixty days after a party is served with a complaint, crossclaim, counterclaim, third-party claim, or other pleading that asserts a cause of action to which this chapter applies, or <u>at a later time on a showing of good cause</u>, the party may file a special motion to dismiss the cause of action or part of the cause of action.

HRS § 634G-3(a) (emphasis added).

"Good cause depends upon the circumstances of the individual case, and a finding of its existence lies largely in the discretion of the officer or court to which the decision is committed." <u>Chen v. Mah</u>, 146 Hawai'i 157, 178, 457 P.3d 796, 817 (2020) (citation modified).

Here, the Hus were served with RCA's complaint on November 30, 2023. In a declaration to the court, Lenhart declared that he called RCA's counsel that same day and explained he might not be counsel of record in the proceeding, because he was "in the process of tendering defense of this matter" to the Hus' "various insurance carriers." Lenhart further explained that he "wished to avoid submitting substantive pleadings that might [have] conflict[ed] with the approach of insurance defense counsel" and wished to avoid charging the Hus for duplicative work that the insurance carriers might have undertaken.

The parties agreed to extend the deadline to answer the complaint to January 17, 2024.

All three insurance carriers, however, ultimately denied the Hus' request for indemnification and defense, with the last denial letter received on January 20, 2024. Lenhart filed the Hus' answer to RCA's complaint on January 17, 2024, and the First Amended Answer on January 31, 2024, to avoid default.

In a joint report, the parties agreed that, "[p]ending resolution of [the Hus'] insurance coverage matters, the parties have agreed to delay Initial Disclosures" and then set forth various deadlines.

Lenhart argued that he interpreted the statement in the joint report to mean "that opposing counsel was agreeing that we were going to put everything kind of on hold on this proceeding until we knew whether or not" one of the insurance carriers was going to defend the Hus against RCA's complaint. As such, Lenhart "treated the receipt of the final insurance denial letter as the start of a new 'clock' as to the 60-day period for filing" the Hus' HPEPA motion to dismiss.

Lenhart filed the HPEPA motion on March 15, 2024, fifty-five days after receiving the last denial letter.

The circuit court admonished Lenhart for not specifically requesting an extension of the sixty-day deadline to file the motion to dismiss, but ultimately found good cause for the delay because "there seem[ed] to have been some

understanding that everything would be delayed or put off until the insurance matter was scheduled."

Considering there was some uncertainty as to who would represent the Hus, RCA was aware of that uncertainty, the parties agreed to postpone some deadlines based on that uncertainty, and the Hus filed their HPEPA motion to dismiss within sixty days of the resolution of that uncertainty, we cannot say the circuit court abused its discretion in finding good cause existed for the untimely filing.

**B.     Circuit Court Did Not Err by Dismissing RCA's Complaint Under HPEPA**

In its second and third points of error, RCA challenges the dismissal of its complaint.  RCA asserts that the circuit court erred in holding that the Letter fell under the scope of HRS Chapter 634G, because the Hus "did not show that the dispute between the parties is a matter of public concern"; instead, the Letter "is nothing more than a personal grievance." RCA further asserts that, even if the Letter fell under HRS Chapter 634G, it met its prima facie burden as to all of its causes of action.

We review the circuit court's decision de novo. Anderson v. Anderson, No. A25-1075, 2026 WL 1128755, at *4 (Minn. Ct. App. Apr. 27, 2026) (explaining that it reviews "a district court's decision on a special motion for expedited relief [under UPEPA] de novo"); Valve Corp. v. Bucher L. PLLC,

571 P.3d 312, 318 (Wash. Ct. App. 2025) ("We review the denial of a UPEPA motion to dismiss de novo."); Andes Roofing, LLC v. Rusnak, 726 S.W.3d 13, 17 (Ky. Ct. App. 2025) (reviewing lower court's decision under UPEPA de novo); see HRS § 634G-11 ("In applying and construing this uniform act, consideration shall be given to the need to promote uniformity of the law with respect to its subject matter among states that enact it.").

As stated above, the court must dismiss a cause of action or part of a cause of action if (1) the movant proves HPEPA applies; (2) the non-movant fails to prove an exception applies; and either (3)(A) the non-movant fails to prove a prima facie case as to each element of each cause of action or (3)(B) the movant proves the non-movant failed to state a cause of action upon which relief can be granted or the movant proves there is no genuine issue of material fact. HRS § 634G-6.

### 1. HPEPA Applies

For the first factor, the movant must establish "under section 634G-2(a) that this chapter applies[.]" HRS § 634G-6(a)(1). Under HRS § 634G-2(a) (Supp. 2022), the movant must establish that the non-movant's cause of action was based on communications made in governmental proceedings, communications about issues under consideration in governmental proceedings, or speech or conduct on a matter of public concern:

> **[§634G-2] Scope of chapter.** (a) Except as otherwise provided in subsection (b), this chapter shall apply to a

cause of action asserted against a person based on the person's:

> (1) Communication in a legislative, executive, judicial, administrative, or other governmental proceeding;
>
> (2) Communication on an issue under consideration or review in a legislative, executive, judicial, administrative, or other governmental proceeding; or
>
> (3) Exercise of the right of freedom of speech or of the press, the right to assemble or petition, or the right of association, guaranteed by the United States Constitution or the [Hawai'i] State Constitution, on a matter of public concern.

(Emphasis added.)

On appeal, RCA argues that the Letter's content was not a matter of public concern. Thus, we focus our analysis on whether the Hus' Letter was on a matter of public concern.

HPEPA, however, does not define "on a matter of public concern." HRS § 634G-2.

The Hawai'i Supreme Court "generously interprets the civil rights bestowed by the Hawai'i Constitution," holding that "article I, section 4 provides free speech rights 'at least as expansive as those provided by the United States Constitution.'" In re KAHEA, 150 Hawai'i 43, 56, 497 P.3d 58, 71 (2021) (emphasis omitted) (quoting State v. Russo, 141 Hawai'i 181, 190, 407 P.3d 137, 146 (2017)). The United States Supreme Court has explained that "[s]peech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a

18

subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." Snyder v. Phelps, 562 U.S. 443, 453 (2011) (citation modified).

At least two state courts interpreting their state's version of UPEPA have applied this definition to determine whether speech is a matter of public concern. See M.G. v. Bainbridge Island Sch. Dist. #303, 566 P.3d 132, 145 (Wash. Ct. App. 2025); Mackey v. Krause, 575 P.3d 1162, 1173-74 (Utah 2025). We likewise apply this definition. See HRS § 634G-11 ("In applying and construing this uniform act, consideration shall be given to the need to promote uniformity of the law with respect to its subject matter among states that enact it.").

The court must "consider the parties' pleadings, the motion, any replies and responses to the motion, and any evidence that could be considered in ruling on a motion for summary judgment under the applicable" Hawaiʻi Rules of Civil Procedure. HRS § 634G-5 (Supp. 2022).

Here, RCA's causes of action were based on the Letter. The Letter was sent to RCA and various government agencies. The content of the Letter alleged, among other things, that the Project "and the many illegal structures and activities at Marconi Point Condominium Project" were affecting "the sensitive coastal environment," the impacts of which were initially reported on by Environment Hawaiʻi in November 2022.

19

In particular, the Letter alleged RCA allowed "vehicular access to the beach areas for '4-wheeling' in sensitive environmental areas having nesting native birds and turtles"; dredged "wetlands areas at the Marconi Project (having endemic ('native') birds) and disturb[ed] that wildlife without a dredging permit from the Army Corps of Engineers and/or from the U.S. Fish & Wildlife Service"; and allowed "the construction of illegal structures (including construction and occupancy of illegal commercial and industrial warehouses) for residential, commercial, and industrial uses and purposes at the Marconi Point Condominium Project and renting such structures out to the public." (Emphasis omitted.) Among other laws and ordinances, the Letter alleged the aforementioned activity violated federal and state environmental laws.

Given the robust environmental protections enshrined in our state constitution, the Hus' speech regarding development of agricultural land and degradation of the environment can fairly be considered as relating to a matter of value and concern to the people of Hawaiʻi. Cf. Haw. Const. art. XI, §§ 1, 3, 9; In re KAHEA, 150 Hawaiʻi at 54, 497 P.3d at 69 ("KAHEA's opposition to development on Mauna Kea falls squarely within the heartland of the First Amendment's protections."). Thus, the Letter's content was on a matter of public concern.

As such, HPEPA applies.

### 2. RCA Failed to Prove Its Causes of Action Fell Under an Exception

Because the Hus established that HPEPA applied, the burden then shifted to RCA to demonstrate its causes of action were exempt from HPEPA under HRS § 634G-2(b) (Supp. 2022). HRS § 634G-6(a)(2). Under HRS § 634G-2(b), causes of action brought against or by government employees or entities acting in an official capacity or against those offering goods or services are exempt from HPEPA:

> (b) This chapter shall not apply to a cause of action asserted:
>
> (1) Against a governmental unit or an employee or agent of a governmental unit acting or purporting to act in an official capacity;
>
> (2) By a governmental unit or an employee or agent of a governmental unit acting in an official capacity to enforce a law to protect against an imminent threat to public health or safety; or
>
> (3) Against a person primarily engaged in the business of selling or leasing goods or services if the cause of action arises out of a communication related to the person's sale or lease of the goods or services.

HRS § 634G-2(b).

Here, RCA's opposition to the Hus' motion to dismiss argued only that the Hus did not meet their burden of showing HPEPA applied; RCA did not argue that its causes of action were exempt, nor does it make any such argument on appeal. And the record does not demonstrate RCA could make such an argument.

As such, RCA failed to show its causes of action fell under an exemption to HPEPA.

### 3. RCA Failed to Establish a Prima Facie Case as to Each Element of Its Three Causes of Action

The third factor is satisfied if <u>either</u> (A) the non-movant fails to prove a prima facie case as to each element of each cause of action <u>or</u> (B) the movant proves the non-movant failed to state a cause of action upon which relief can be granted or the movant proves there is no genuine issue of material fact.  HRS § 634G-6(a)(3).

RCA's complaint asserted three causes of action: Count I (Declaratory Relief), Count II (Tortious Interference), and Count III (Injunctive Relief).

### a. Count I (Declaratory Relief)

RCA contended it would "likely prevail on the merits of Count I because DPP has issued building permits for the warehouses."

To establish a prima facie case for declaratory relief under HRS § 632-1 (2016), the complainant must produce evidence demonstrating that a declaratory judgment "will serve to terminate the uncertainty or controversy giving rise to the proceeding":

> [A] party has standing to seek declaratory relief in a civil case brought pursuant to HRS § 632-1 (1) where antagonistic claims exist between the parties (a) that indicate imminent and inevitable litigation, or (b) where the party seeking declaratory relief has a concrete interest in a legal relation, status, right, or privilege that is challenged or denied by the other party, who has or asserts a concrete interest in the same legal relation, status, right or privilege; and (2) <u>a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding.</u>

22

Ching v. Case, 145 Hawaiʻi 148, 173, 449 P.3d 1146, 1171 (2019) (emphasis added) (quoting Tax Found. of Hawaiʻi v. State, 144 Hawaiʻi 175, 202, 439 P.3d 127, 154 (2019)).  Thus, "the dispositive question is whether 'the court is satisfied . . . that a declaratory judgment will serve to terminate the uncertainty or controversy giving rise to the proceeding,'" which is a question of law.  Island Ins. Co. v. Perry, 94 Hawaiʻi 498, 502, 17 P.3d 847, 851 (App. 2000).

In Island Insurance Co., this court held that an insured is a necessary and indispensable party where the insurer seeks a declaratory judgment to determine its liability to the insured.  94 Hawaiʻi at 502, 17 P.3d at 851.  This court explained that, without the insured, the declaratory judgment does not bind the insured and the insured could relitigate the matter.  Id.  Thus, the declaratory judgment would not "serve to terminate the uncertainty or controversy giving rise to the proceeding."  Id.  This court remanded the case "for the entry of an order dismissing this case for lack of jurisdiction to enter a declaratory judgment."  Id.

In Ohana Control Systems, Inc. v. Hayashi, a contractor sought a declaratory judgment that the State of Hawaiʻi Department of Education (**DOE**) was not entitled to recover under performance bonds issued by an insurance company.  157 Hawaiʻi 490, 580 P.3d 670, No. CAAP-23-0000443, 2025 WL 3633441,

23

at *1, *5 (App. Dec. 15, 2025) (mem. op.).  This court held that, because the insurance company was not a party to the action, the insurance company would not be bound by such a declaratory judgment, and thus, the circuit court "lacked jurisdiction to enter a declaratory judgment about DOE's entitlement to recover under [the insurance company's] performance bonds."  Ohana Control Sys., Inc., 2025 WL 3633441, at *5.

Here, RCA sought "a declaratory ruling that the warehouses may remain upon [RCA's] Units, that [RCA is] not required to remove the warehouse [sic] that have already been constructed, and that [RCA] may continue with the construction of the warehouses as intended."

In other words, RCA wanted the circuit court to confirm that its permits were valid and that it had an affirmative right to build its warehouses.

But RCA did not join the State or City and County of Honolulu through its relative agencies.

Similar to the declaratory judgments sought in Island Insurance Co. and Ohana Control Systems, Inc., any declaratory judgment that RCA's permits were valid and construction could continue would not have bound the state or city agencies tasked with regulating the construction of structures on the Property, and the same concerns raised by the Letter related to

24

construction of the warehouses could be relitigated. See HRS § 632-1; Island Ins. Co., 94 Hawai'i at 502, 17 P.3d at 851; Ohana Control Sys., Inc., 2025 WL 3633441, at *5. Accordingly, RCA failed to show that a declaratory judgment would "serve to terminate the uncertainty or controversy giving rise to the proceeding." See Ching, 145 Hawai'i at 173, 449 P.3d at 1171.

Thus, RCA failed to establish a prima facie case as to the second element for obtaining a declaratory judgment.

### b.   Count II (Tortious Interference)

Count II (Tortious Interference) of RCA's complaint alleged that the Hus' "actions were made with the intent and malice to harm [RCA's] contractual and business relationships without legal justification."

"Hawai'i recognizes two separate torts:  (1) tortious interference with contractual relations and (2) the tort of intentional or tortious interference with prospective business advantage." Wadsworth v. KSL Grand Wailea Resort, Inc., 818 F. Supp. 2d 1240, 1252 (D. Haw. 2010) (first citing Meridian Mortg. Inc. v. First Hawaiian Bank, 109 Hawai'i 35, 45, 47-48, 122 P.3d 1133, 1143, 1145-46 (App. 2005); then citing Robert's Hawaii Sch. Bus, Inc. v. Laupahoehoe Transp. Co., 91 Hawai'i 224, 258-59, 982 P.2d 853, 887-88 (1999)).

While similar, each tort contains its own distinct elements that must be satisfied. See id. Because RCA, in its

opposition, focuses on the elements for tortious interference with contractual relations, we, too, narrow our analysis to that specific tort.  See id.

A viable prima facie case for tortious interference with contractual relations is supported by evidence demonstrating six elements:

> (1) a contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional inducement of the third party to breach the contract; (4) the absence of justification on the defendant's part; (5) the subsequent breach of the contract by the third party; and (6) damages to the plaintiff.

Buscher v. Boning, 114 Hawaiʻi 202, 215 n.6, 159 P.3d 814, 827 n.6 (2007) (quoting Kahala Royal Corp. v. Goodsill Anderson Quinn & Stifel, 113 Hawaiʻi 251, 267 n.17, 151 P.3d 732, 748 n.17 (2007)).

RCA failed to establish a prima facie case as to the fourth element, "absence of justification on the defendant's part."  RCA contended the Hus' "conduct was not justified because the warehouse construction is fully permitted."  It attached, as Exhibit 1 to its opposition, DPP website printouts, showing that the construction of the eight warehouses in question was permitted.

But the Hus' Letter also takes issue with the uses to which RCA puts the warehouses, not merely the structures themselves.  For example, the Letter points to the "advertisement for and leasing of warehouse space to individuals

26

and entities who are not leasehold or fee owners of the Project"; the "false advertisement of the warehouses as being in an 'industrial park'"; and the "use of the Project for illegal and noncompliant functions[,]" among others. See id. Because the website printouts of the permits do not address the use of the warehouses, the printouts do not establish that the Hus' conduct was unjustified.

Thus, RCA failed to establish a prima facie case as to the fourth element of tortious interference with contractual relations.

### c. Count III (Injunctive Relief)

A viable prima facie case for injunctive relief requires the plaintiff to produce evidence as to the following three elements:

> (1) whether the plaintiff has prevailed on the merits;
> (2) whether the balance of irreparable damage favors the issuance of a permanent injunction; and (3) whether the public interest supports granting such an injunction.

Off. of Hawaiian Affs. v. Hous. & Cmty. Dev. Corp. of Hawaii, 117 Hawaiʻi 174, 212, 177 P.3d 884, 922 (2008), rev'd and remanded, 556 U.S. 163 (2009), reconsidered, 121 Hawaiʻi 324, 219 P.3d 1111 (2009).[5]

---

[5] The 2008 Supreme Court of Hawaiʻi case was reversed and remanded on a federal question by the United States Supreme Court. It was subsequently reconsidered on state law grounds in the Supreme Court of Hawaiʻi's 2009 decision.

27

Here, RCA's opposition did not present any argument as to the elements of Count III (Injunctive Relief), but instead summarily asserted that, should it prevail on Count II (Tortious Interference), it would also "be entitled to injunctive relief under Count III, preventing further interference with [RCA's] contractual and business relationships." Nothing in RCA's opposition before the circuit court, or in its opening brief on appeal, supports a determination that the "balance of irreparable damage favors the issuance of a permanent injunction" or that the "public interest supports granting such an injunction." See Off. of Hawaiian Affs., 117 Hawai'i at 212, 177 P.3d at 922.

Thus, RCA did not establish a prima facie case as to each element for injunctive relief.

In sum, because the Hus demonstrated that HPEPA applied to RCA's causes of action, RCA failed to show its causes of action fell under an exemption to HPEPA, and RCA failed to prove a prima facie case as to its three causes of action, the circuit court did not err in dismissing RCA's complaint. See Reyes v. Kuboyama, 76 Hawai'i 137, 140, 870 P.2d 1281, 1284 (1994) ("This court may affirm a grant of summary judgment on any ground appearing in the record, even if the circuit court did not rely on it." (citations omitted)).

## C.    Challenge to Attorney's Fees and Costs Is Waived

Finally, RCA challenges the award of the Hus' attorney's fees and costs based on its assertion that the circuit court erred in dismissing its complaint under HPEPA. RCA otherwise presents no argument in the argument section of its opening brief to support this point of error.  Thus, we deem this point waived.  See Hawaiʻi Rules of Appellate Procedure Rule 28(b)(7) (requiring an opening brief to include an argument section "containing the contentions of the appellant on the points presented and the reasons therefor" and stating that "[p]oints not argued may be deemed waived").

## IV.    CONCLUSION

Based on the foregoing, we affirm the circuit court's May 20, 2024 order granting the Hus' HPEPA motion to dismiss and May 21, 2024 Final Judgment.

On the briefs:

Michael A. Yoshida,
Gregory W. Kugle,
Ross Uehara-Tilton,
David H. Abitbol,
(Damon Key Leong Kupchak
Hastert),
for Plaintiffs-Appellants.

Peter J. Lenhart
Tori R.K. Maeshiro,
for Defendants-Appellees.

/s/ Katherine G. Leonard
Presiding Judge

/s/ Sonja M.P. McCullen
Associate Judge

/s/ Kimberly T. Guidry
Associate Judge